# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**AUTO-OWNERS INSURANCE COMPANY,**

            **Plaintiff,**

-vs-                                        **Case No. 6:05-cv-334-Orl-31JGG**

**SOUTHEAST FLOATING DOCKS, INC., and ALAN L. SIMPSON,**

            **Defendants.**

## ORDER

This matter comes before the Court on the Motion for Summary Judgment (Doc. 214) filed by the Plaintiff, Auto-Owners Insurance Company ("Auto-Owners"), the Response (Doc. 220) filed by the Defendants, Southeast Floating Docks, Inc. ("Southeast") and Alan L. Simpson ("Simpson"), and the Reply (Doc. 230) filed by Auto-Owners.

**I.    Background**

Southeast contracted to build a dock for Rivermar Contracting Company ("Rivermar"). Needing a surety, Southeast executed an indemnity agreement (the "Indemnity Agreement") in favor of Auto-Owners. Simpson also signed the Indemnity Agreement individually. Auto-Owners, as surety, executed a performance bond (the "Bond") on behalf of Southeast, as principal, and in favor of Rivermar, as obligee.

Subsequently, a dispute developed between Rivermar and Southeast regarding the project. Rivermar made a claim on the Bond. Southeast sued Rivermar in state court, Rivermar counterclaimed, and several years of litigation followed.

Initially, Auto-Owners and Southeast cooperated in regard to Rivermar's claim. Around the end of 2004, Auto-Owners opted to deal with Rivermar on its own, rather than alongside Southeast, and some time thereafter settled with Rivermar for the penal sum of the bond – $956,987. The settlement released only Auto-Owners, not Southeast, from liability to Rivermar.

Auto-Owners filed suit, seeking indemnification from Southeast and Simpson. Southeast and Simpson argued, *inter alia,* that their obligation under the Indemnification Agreement was barred by bad faith on the part of Auto-Owners in settling with Rivermar. On June 1, 2006, after a three-day trial, the jury found that Auto-Owners had not made the payment to Rivermar in good faith and was therefore barred from recovering under the Indemnity Agreement. (Doc. 179).

On June 16, 2006, Auto-Owners filed a motion for judgment as a matter of law or for a new trial (Doc. 189), on the grounds that the Defendants had failed to produce sufficient evidence that it acted in bad faith. The Court found that Auto-Owners had failed to move for judgment as a matter of law at the close of all the evidence, as required by Rule 50. (Doc. 205 at 9-10). However, the Court found that the Defendants had failed to produce any credible evidence contradicting Auto-Owners' evidence that it acted in good faith. (Doc. 205 at 14). Therefore, the jury's conclusion was against the great weight of the evidence, and Auto-Owners was entitled to a new trial. (Doc. 205 at 14).

A second trial is scheduled for April 2007.  Auto-Owners now moves for summary judgment as to its entitlement to recover the settlement payment and associated costs and expenses from the Defendants pursuant to the Indemnity Agreement.

## II.     Summary Judgment Standard

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the

non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**III.     Analysis**

In Section 2 of the Indemnity Agreement, the Defendants agreed to indemnify Auto-Owners from "any and all liability, loss, costs, damages, attorneys' fees and expenses of whatever kind or nature which [Auto-Owners] may sustain or incur by reason or in consequence of executing" the bond. (Doc. 212-4 at 1). Pursuant to Section 2, Auto-Owners now seeks to recover the amount of its settlement payment to Rivermar, $956,987, plus the attorneys fees and costs it expended in reaching that settlement and pursuing the instant action, for a total of $1,458,716.89.[1] (Doc. 214 at 11).

Three other sections of the Indemnity Agreement are particularly relevant to the resolution of the instant motion: Section 4(g) authorizes Auto-Owners to "adjust, settle or compromise any claim, demand, suit or judgment" upon the Bond "unless the Indemnitors" – *i.e.*, the Defendants – "shall request in writing [that Auto-Owners] litigate such claim or demand ... and said Indemnitors shall, simultaneously with such request, deposit with [Auto-Owners] collateral satisfactory to it ... sufficient in amount to pay any judgment or judgments rendered, or that may be rendered, with interest, costs, expenses and attorneys' fees". (Doc. 214-4 at 2). Section 6 provides that the Defendants' indemnification obligation extends to "the full amount of any and all money paid **in good faith** by the surety ... in settlement or compromise of any claims, suits and judgments

---

[1] At the time of trial, Auto-Owners contended that it had incurred a total of $1,295,696.85 in damages. (Doc. 214 at 11). The Defendants did not offer any evidence at trial to challenge that figure and have not offered any such evidence in their response to the instant motion.

thereunder, under the belief that it [was] liable therefor, whether liable or not, as well as to any and all disbursements on account of costs, attorneys' fees and expenses as aforesaid, which may be made under the belief that such were necessary, whether necessary or not." (Doc. 214-4 at 2) (emphasis added). And Section 7 of the Indemnity Agreement provides that evidence of payment of the settlement amount, such as the payment voucher, will constitute prima facie evidence of the amount of the Defendants' liability.

After a lengthy recitation of trial testimony and other evidence, Auto-Owners contends that there is no genuine issue of material fact as to the following: that Rivermar made a claim under the Bond; that Auto-Owners investigated that claim; that, based on the investigation and pursuant to Section 4(g) of the Indemnity Agreement, Auto-Owners demanded that the Defendants post collateral, which they declined to do; and that Auto-Owners then settled Rivermar's claim for the penal amount of the Bond. (Doc. 214 at 12). The Defendants do not seriously contest these facts, and therefore Auto-Owners has made a *prima facie* showing that it is entitled to indemnification. As noted in the seminal case of *PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.*, 838 A.2d 135, 146 (Conn. 2004), this showing shifts the burden of proof to the Defendants to show that Auto-Owners did not make the payment in good faith.

Before making their substantive bad faith argument, the Defendants first contend that this Court's denial, at trial, of Auto-Owners' motion for judgment as a matter of law on the bad faith issue is dispositive as to the current motion. In denying the motion, the Court stated that it was doing so because

> the surety on the one hand has to act in the best interests of the insured, [and] on the other hand it obviously has self-interest and can legitimately protect that self-interest. And there's no way one can establish a bright line between the two

> obligations, and there's no real case law I'm aware of that adequately does that, which means that these issues, by their very nature, are *almost* necessarily jury issues.

(Doc. 220 at 4) (emphasis added). The Defendants contend that it would be inconsistent to grant summary judgment to Auto-Owners now after having ruled "that the evidence and testimony presented during trial was sufficient to take the case to the jury." (Doc. 220 at 4). The Defendants' argument conflicts with the plain text of Rule 50(b), which provides that a court that does not grant a motion for judgment as a matter of law "is considered to have submitted the action to the jury **subject to the court's later deciding the legal questions raised by the motion**." Rule 50, Fed.R.Civ.P. (emphasis added). The Defendants have not cited any case law suggesting that the Court cannot decide this legal issue in the context of summary judgment rather than a Rule 50 motion, and the Court's research has not uncovered any.

Turning to their substantive argument, the Defendants offer a lengthy recitation of trial testimony and other evidence, which may be briefly summarized as follows: From 2001 through late 2004, Auto-Owners believed that Rivermar's claim lacked merit and was being adequately handled by attorney Rosemary Hayes ("Hayes"). (Doc. 220 at 5). During this period, Auto-Owners set aside only $5,000 in reserve for the claim. (Doc. 220 at 5). In late 2004, Tom Froman ("Froman") of Auto-Owners was contacted by an agent of Rivermar's parent company regarding the claim. (Doc. 220 at 6). Froman became concerned that the claim was not being handled properly, and sent an outside attorney, Tom Crafton ("Crafton") to investigate the claim. (Doc. 220 at 6-7). Froman also raised the loss reserve on the claim from $5,000 to $800,000. (Doc. 220 at 7). Crafton spent half an hour in Hayes' office examining documents and, accompanied by an engineer, spent less than three hours on the job site inspecting the docks. (Doc. 220 at 8-9). Auto-

Owners did not notify Hayes or the Defendants of their discussions and meetings with Rivermar. (Doc. 220 at 9-11). Froman did not want Hayes to throw a monkey wrench into the settlement negotiations. (Doc. 220 at 11). Eventually, Auto-Owners settled all of Rivermar's claims against it, including any bad faith claim against Auto-Owners, but did not obtain a release of any claims against Southeast or Simpson. (Doc. 220 at 11-13). Froman testified that he believed Hayes committed malpractice in representing Auto-Owners and that her malpractice increased the amount Auto-Owners had to pay to settle with Rivermar. (Doc. 220 at 12).

To establish bad faith, the Defendants argue that genuine issues of material fact exist as to whether Auto-Owners adequately investigated the claims and defenses in the underlying litigation between Southeast and Rivermar. (Doc. 220 at 15). The Court suspects that Auto-Owners, having relied on Hayes' representations, would concede this point, and in any event has no difficulty in concluding that a genuine issue of material fact exists regarding Auto-Owners' investigation of this claim – at least for the first several years of its existence. However, a failure to conduct a sufficient investigation is not enough, on its own, to support a finding of bad faith. *PSE Consulting* at 155. Something more is required.

The Defendants argue that this case, as was true of *PSE Consulting*, contained a self-interested settlement that was "tainted by a confluence of circumstances from which a jury could properly have inferred improper motive." (Doc. 220 at 16).[2] The Defendants point out that in both cases the surety "expressed concern" over a bad faith claim and required its release as part of the

---

[2] A self-interested settlement is not enough, on its own, to support a finding of bad faith on the part of the surety, but it may do so when it is accompanied by evidence of an improper motive. *PSE Consulting* at 160.

settlement. (Doc. 220 at 16). In addition, the sureties in both cases excluded their principals from settlement negotiations[3] and reached settlements that did not release the principal. (Doc. 220 at 16).

Although these facts parallel some of the facts present in *PSE Consulting*, the Court finds that they are not sufficient to permit a reasonable jury to conclude that Auto-Owners acted in bad faith. A mere expression of concern over a bad faith claim cannot support a finding that the bad faith claim was the primary basis for Auto-Owners' settlement with Rivermar. And the fact that the bad faith claim was included in the release is also not significant; no reasonable surety would leave even minor claims hanging over its head when it could obtain a release as to all potential liability. Finally, Auto-Owners was under no obligation, contractually or otherwise, to include Southeast and Simpson in the settlement negotiations or to reach a settlement that benefitted them. Given the hostility that developed between the parties – with dueling allegations of conflicts of interest, allegations of malpractice, and so forth – no reasonable jury could conclude that Auto-

---

[3]The parties agree that Auto-Owners did make two attempts to meet and discuss resolution of the case against Rivermar after Crafton conducted his investigation. The first such attempt collapsed because Hayes made the extraordinary demand that a court reporter record the discussions. (Trial transcript at 340-41). The second fell through on the day of the meeting, apparently because Hayes and Simpson refused to sign a confidentiality agreement – a common requirement under these circumstances. (Trial transcript at 164-65). Given these undisputed facts, it strains credulity to suggest that Auto-Owners was the one responsible for the lack of cooperation. This is particularly true given that Hayes had represented Auto-Owners (as well as Southeast and Simpson) through the bulk of the suit against Rivermar and was therefore committing an ethical violation by taking positions contrary to the interest of Auto-Owners. *See* trial transcript at 331-35.

Owners' failure to perform what would be, in essence, an act of charity (i.e., negotiating a settlement that included Southeast and Simpson) was evidence that it was acting in bad faith.[4]

The Defendants also make a number of arguments based on facts unique to this case. However, none of them are sufficient to support a finding of bad faith or even improper motive on the part of Auto-Owners. For example, the Defendants contend that Auto-Owners' 2004 investigation was just window dressing, intended to allow Auto-Owners to disguise its upcoming settlement of the bad faith claim as a settlement of the bond claim. To that end, the Defendants point out that Hayes testified that Crafton "spent approximately 30 minutes" in Hayes' office, "examining extensive files which would have taken days to properly review." (Doc. 220 at 7). The Defendants' implication – that Crafton spent *only* approximately 30 minutes reviewing all of the files of the litigation with Rivermar – is at odds with the record. Hayes testified that, pursuant to requests from Crafton, she e-mailed him hundreds of pages of documents (such as pleadings, deposition transcripts, and pictures of the project), and shipped him hundreds more (such as financial statements and bills of lading) via Federal Express. (Trial transcript at 308-317). In the

---

[4]Compare this to the situation in *PSE Consulting*, where the principal argued that the obligee was not owed any money at all when the surety paid $700,000 to it. *Id.* at 149. The principal was able to point out that the surety made those payments despite the surety's own investigation showing that the obligee had already received $400,000 more than its work was worth. *Id.* at 153-54. Although the surety disputed its own figures – arguing that they understated the true value of the principal's work, *id.* at 154 – this evidence provided a basis from which a reasonable jury could conclude that the surety made the payments to settle its bad faith claim rather than a claim against the bond. The Defendants in this case have not produced any comparable evidence.

The Court also notes that, under Section 4(g) of the Indemnity Agreement, Southeast and Simpson had the ability to prevent Auto-Owners from settling by posting collateral, which they declined to do. The principal in *PSE Consulting* had no such ability. *See PSE Consulting* at 150 (explaining that under indemnity agreement in that case, surety had "exclusive right to determine for itself and [the indemnitor] whether any claim or suit brought ... shall be settled or defended").

same vein, the Defendants note that when Crafton visited the Rivermar construction site on December 1, 2004 along with an engineer, the duo spent "less than 3 hours inspecting the site" at a time when the docks had not yet been completely installed, maintenance had not been performed, and the area had, months earlier, "been exposed to hurricane conditions". What the Defendants fail to do, however, is connect the dots: They do not present any evidence that 3 hours was insufficient for an engineer to adequately assess the issues underlying Rivermar's claim, such as whether the docks' concrete was thick enough, whether they were level, and how many inches of clearance they provided above the water. *See* trial transcript at 151-52. They have produced no evidence, testimonial or otherwise, that the engineer's analysis of these fundamental issues was tainted because the docks had not been completely installed, or had not been properly maintained, or had been exposed to "hurricane conditions." In short, the Defendants have failed to produce any evidence from which a reasonable jury could conclude that the investigation was a sham.

The Defendants' contention that Auto-Owners was primarily or largely motivated by the bad faith claim is undercut by their failure to address the underlying claim. Froman testified that, after Crafton's investigation, Auto-Owners concluded that repairing and completing the docks would cost about $700,000, and that Rivermar could recover approximately $1.5 million in attorneys' fees on top of that. (Trial transcript at 173). The Defendants have not challenged the factual or legal bases of these conclusions. Thus, the Defendants have not offered any basis for a reasonable jury to conclude anything other than that this was a $2.2 million exposure – independent of any bad faith claim – that was settled for about $950,000. There is simply no reasonable basis to conclude that Auto-Owners was motivated by something other than this potential liability.

Finally, the Defendants focus on statements made by Froman that (1) Hayes committed malpractice in her representation of Auto-Owners and (2) a "substantial" portion of the settlement with Rivermar resulted from that malpractice. (Doc. 220 at 18). The Defendants argue that if a portion of the settlement payment was caused by Hayes' (alleged) malpractice, then it was not caused by the execution of the bond, as required by Section 2 of the Indemnity Agreement. (Doc. 220 at 18). The Court first notes that this argument goes to damages, not bad faith.[5] Further, the Defendants have not produced any legal support for their contention that damages to the surety resulting from, for example, delays caused by the surety's attorney are not damages "caused" by the execution of the bond, at least for settlement purposes. A right-to-settle clause, such as Section 4(g) of the Indemnity Agreement, typically provides a surety with "wide discretion" in settling claims, "even where the principal is not liable for the underlying claim." *PSE Consulting* at 141. In addition, Auto-Owners has filed a malpractice claim against Hayes, and therefore the issue of her alleged malpractice is currently being decided by another court. And even if this Court were in a position to determine whether Hayes committed malpractice, the Defendants have not provided any evidence from which a reasonable jury could determine the amount of damages caused by that malpractice or the portion of the settlement payment (if any) that represented payment for those damages.

---

[5]Neither side has provided any specifics as to the malpractice that Hayes is alleged to have committed. Based on the testimony at trial, the Court assumes that Froman believes Hayes was negligent in responding to Rivermar's claim, extending the life of that suit and thereby increasing the attorneys' fees that Rivermar could claim under the bond. However, regardless of the manner in which she was allegedly negligent, the majority of courts agree that the principal must establish something more than mere negligence on the surety's part to prove bad faith. *PSE Consulting* at 151-52.

Finally, during the whole time that Hayes was representing Auto-Owners (and therefore could have been committing malpractice against it), Hayes was also representing Southeast and Simpson. Thus, to the extent that Hayes committed malpractice that inflated Rivermar's claim, she was doing so on behalf of *both* Auto-Owners and the Defendants. At the very least, it would be inequitable to permit the Defendants to rely on the misdeeds of their own agent to avoid their obligations under the Indemnity Agreement.

## IV.   Conclusion

The Defendants have not challenged Auto-Owners' *prima facie* case and have failed to produce any evidence from which a reasonable jury could conclude that Auto-Owners acted in bad faith in settling Rivermar's claim.

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the Motion for Summary Judgment (Doc. 214) filed by the Plaintiff, Auto-Owners Insurance Company, is **GRANTED** as to liability. The trial of this case is removed from the April docket, and all pending motions are **DENIED AS MOOT**. On or before March 21, 2007, Auto-Owners shall file a motion for entry of final judgment, accompanied by whatever documentation it requires to substantiate its claim for damages, including attorneys fees and costs through the date of this order. In its memorandum accompanying this motion, Auto-Owners should address, *inter alia*, the

issue of its entitlement to prejudgment interest under Michigan law, including the statutory provisions upon which it relies and a calculation of the interest due under that provision.  If the Defendants object to the amount claimed, they may file a response not more than 20 days after Auto-Owners files its motion.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 1, 2007.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party